AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone Xs Max Cellular Phone<br>IMEI 357268091333031 | )<br>)<br>)<br>)<br>)    Case No.   '22  MJ3882<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC  371/545 | Conspiracy/Smuggling |
| 21 USC 952 and 960 | Importation of Controlled Substances |

The application is based on these facts:

See Attached Affidavit of Homeland Security Investigations (HSI)Special Agent John P. Christensen, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JOHN P CHRISTENSEN    Digitally signed by JOHN P CHRISTENSEN
Date: 2022.10.21 09:29:12 -07'00'

*Applicant's signature*

Special Agent John P. Christensen, HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: _____10/21/2022_____

*Judge's signature*

City and state: San Diego, California

Hon. Karen S. Crawford, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, John P. Christensen, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1.     I make this affidavit in support of an application for a warrant to search a cellular telephone found in the possession of Roberto PARTIDA Guillen on September 3, 2021, as he entered the United States from Mexico, as further described in Attachment A, and seize evidence of violations of federal law, namely Conspiracy, in violation of 18 U.S.C. §371; Smuggling, in violation of 18 U.S.C. § 545; and the Importation of Controlled Substances, in violation of 21 U.S.C. §§ 952 and 960, as further described in Attachment B.  The **Target Telephone** is identified as an Apple iPhone Xs Max, IMEI number 357268091333031.

2.     The **Target Telephone** is currently in the possession of the Department of Homeland Security and is presently stored in Department of Homeland Security ("DHS") custody.  Special Agents seized the **Target Telephone** on September 3, 2021, from Roberto PARTIDA Guillen after approximately 34 kilograms of methamphetamine were discovered in the vehicle he was driving as he was attempting to enter the United States at the Otay Mesa Port of Entry ("POE").

3.     Based on the information below, there is probable cause to believe that a search of the **Target Telephone** will produce evidence of the aforementioned crimes, as more particularly described in Attachment B.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all the information known to investigators about this investigation.  It contains only those facts believed to be necessary to establish probable cause.   In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of narcotics

1

investigations, and my personal observations and knowledge.  When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## TRAINING AND EXPERIENCE

5.      I am a Special Agent for Homeland Security Investigations ("HSI") and have been so employed since February of 2020. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.  I am currently assigned to the HSI Office of the Deputy Special Agent in Charge in San Ysidro, California.

6.      During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern of District of California. I have reviewed the extractions from more than 30 cellular telephones and other similar portable electronic devices in the course of investigating international narcotics trafficking. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at the Ports of Entry.

## BACKGROUND

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics traffickers to work in concert using cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such and the San Ysidro Port of Entry and the Otay Mesa Port of Entry.  With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual

2

*Affidavit in Support of Search Warrant*

responsible for importing the concealed narcotics into the United States.   These communications can occur before, during and after the narcotics are imported into the United States.  For example, prior to the importation, narcotics traffickers frequently communicate with the transporter regarding arrangements and preparation for the narcotics importation.   When the importation is underway, narcotics traffickers frequently communicate with the transporters to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

8.      Based on my training and experience, and conversations with other law enforcement officers, I know that narcotics smugglers work in concert with other individuals and do so by utilizing cellular telephones to maintain communications with co-conspirators to further their criminal activities.   Conspiracies involving the smuggling of controlled substances generate many types of electronic evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, and phone numbers of co-conspirators.

9.      Based upon my training and experience as an HSI Special Agent, and my consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

a.      Drug smugglers use cellular telephones because the devices are mobile and provide instant access to telephone calls, texts, internet, application-based communications platforms (*e.g.*, WhatsApp), and voice messages;

b.      Drug smugglers use cellular telephones because they can actively

3

monitor the progress of the illegal cargo while the conveyance is in transit;

      c.    Drug smugglers, use cellular telephones because the phones help them arrange for the delivery of cargo at predetermined locations and to monitor and plan for arrivals; and

      d.    Drug smugglers use cellular telephones to direct couriers to synchronize drop off and pick up times of the illegal cargo.

10.    Subscriber Identity Module ("SIM") cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists, and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM card that has been utilized in connection with that telephone.

11.    Based on my experience and training, and conversation with other law enforcement officers, I know that the use of cellular telephones by smugglers tends to generate evidence stored on the cellular telephones, including but not limited to emails, text messages, application-based communications, images, audio files, call logs, address book entries, IP addresses, social network data, and location data. This evidence can include records of financial transactions related to the importation and distribution of controlled substances. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

      a.    tending to indicate efforts to import controlled substances from Mexico into the United States;

      b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

4

c.   tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

d.   tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the **Target Telephone**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS IN SUPPORT OF PROBABLE CAUSE

12.   On September 3, 2021, Roberto PARTIDA Guillen attempted to make entry into the United States at the Otay Mesa POE, as the driver, sole occupant, and registered owner of a 2004 Dodge Ram truck. After a canine inspector alerted on the vehicle, Customs and Border Protection officers discovered approximately 34 kilograms of a controlled substance that field tested positive as methamphetamine and approximately 312 grams of a controlled substance that field tested positive for fentanyl in the gas tank of the vehicle he was driving. At the time of entry, inspectors noted that the gas gauge of the vehicle registered ¾ of a tank, both before and after they emptied the tank of its contents.

13.   PARTIDA was arrested for violation of Title 21 United States Code Sections 952 and 960. After waiving his Constitutional rights, PARTIDA denied knowledge of the narcotics. PARTIDA said he had owned the vehicle for about a year, and the gas gauge had always read 3/4 full.  PARTIDA said he was in the habit of filling up with gas every 120 miles driven so he did not run out of gas. At the time of the arrest, PARTIDA gave the agents consent to search his cellular phone, which was an Apple iPhone Xs Max (the **"Target Telephone"**).

5

*Affidavit in Support of Search Warrant*

14.     Based on the consent of PARTIDA, an initial extraction of the data from the **Target Telephone** occurred.  On January 6, 2022, I provided several WhatsApp chats to the interpreter team to translate from Spanish to English.  On January 10, 2022, I received the translations of the chats.

15.     The **Target Telephone** contained an extensive WhatsApp chat with an individual using telephone number 52-332-404-2925 ("2925"). The communication thread between PARTIDA and 2925 extended as far back as February 4, 2020. On February 4, 2020, 2925 asked PARTIDA, "How do you feel about working like on the 16," which he later noted was a Sunday; February 16, 2020, was a Sunday. Then on February 12, 2020, 2925 stated, "I wanted to see if you could do 2 trips." On the same date, PARTIDA said, "I was thinking of going over Friday after work and then delivering it to you on Saturday, and come back on Sunday like Usual, and go back again on Monday after work.  And then the same thing for the next week…" On February 13, 2020, 2925 sent PARTIDA the following series of messages: "… I'll see you there at the same place as last time… let me know when you're 10 away…remember that it shouldn't have a lot of gas."  On February 14, 2020, shortly before 7 PM, PARTIDA mentioned that there was a lot of traffic to 2925 and said, "…Let's see if those guys don't fall asleep on us again. My phone is telling me that it's going to take four hours and twenty minutes."  2925 informed PARTIDA, "It most likely will be until morning," and "Hey, arrive at the same hotel as always." PARTIDA asked for the address to a restaurant to get his bearings and noted that he erases everything; 2925 responded with an address in San Jose. The chats between PARTIDA and 2925 indicate that PARTIDA then drove the vehicle to a hotel in the San Jose area.

16.     The **Target Telephone** also contained an extensive WhatsApp chat with an individual using telephone number 52-664-335-0787 ("0787"). The thread of communication between PARTIDA and 0787 extended back as far as September 25, 2020.  In the chat with 0787, PARTIDA discussed crossing the border and the

6

condition of the vehicle he was driving.  PARTIDA advised 0787 that he wanted to cross on weekends so he didn't miss work. Then, on September 25, 2020, PARTIDA asked "What time should I meet with you to drop off the truck?" On September 30, 2020, PARTIDA stated, "Yes, same as always when I leave in the morning. Everything is all set, right? It's full of gas like always right? The following day, PARTIDA entered the United States from Mexico and contacted 0787, advising, "Buddy, I'm on this side already."  0787 asked, "When did you say you were coming?" and PARTIDA said, "tomorrow when I get off work."  The chats between PARTIDA and 0787 indicate that PARTIDA drove the vehicle to a hotel in the San Jose area.  At one point in the chat, PARTIDA complained to 0787 that he was having trouble "just pumping 20 bucks of gasoline" into the truck. 0787 and PARTIDA discussed the fact that "they'll stop by for it" when PARTIDA arrived at the hotel in San Jose. There were several similar conversations at various times during the WhatsApp chat.  Based on my training and experience, and conversations with other officers with experience in investigating narcotics trafficking offenses, I believe that PARTIDA and 0787 were discussing loading the vehicle with narcotics and driving it to San Jose for further distribution.

17.    In reviewing the extraction of the chat between PARTIDA and 0787, there were numerous occasions where the extraction indicated "empty file" and no data was available.  Based on my training and experience, and conversations with other officers with experience in the forensic extraction of data from cellular phones, I believe that an additional extraction of data from the **Target Telephone** would reveal the data in the "empty file" areas.

18.    Given the facts surrounding the investigation of Roberto PARTIDA Guillen, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in narcotics smuggling, there is probable cause to believe that information relevant to the offenses of conspiracy, smuggling, and

7

illegal importation of controlled substances will be found in the **Target Telephone**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data, would be relevant to proving conspiracy, smuggling, and/or the illegal importation of controlled substances by:

        a.    tending to indicate efforts to import controlled substances from Mexico into the United States;

        b.    tending to identify electronic media accounts–such as email addresses, IP addresses, social media accounts and phone numbers used to facilitate the importation of controlled substances from Mexico into the United States;

        c.    tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

        d.    tending to identify travel to or presence at locations involved in the importation of controlled substances into the United States, such as stash house, load houses, or delivery points;

        e.    tending to identify the user of, or persons with control over or access to, the **Target Telephone**; and

        f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

    19.    Finally, I note that drug conspiracies generally entail detailed and intricate planning as part of efforts to evade detection by law enforcement. In my professional training and experience, I am aware that this requires planning and coordination in the days and weeks (and often months) prior to the relevant narcotics smuggling-related event. Additionally, I am aware that co-conspirators are often unaware of a subject's vehicle or pedestrian stop at a Port of Entry and will continue to attempt to communicate with the subject after the vehicle or pedestrian stop to determine the

*Affidavit in Support of Search Warrant*

whereabouts of their valuable cargo, particularly in the hours following the arrest. Therefore, I believe that the appropriate date range for the search of the **Target Telephone** is from February 4, 2020, up to and including September 3, 2021.

## **METHODOLOGY**

20.     It is not possible to determine, merely by knowing a cellular telephone's make, model and serial number, the nature and types of subscription services and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices over the internet and remotely destroy all the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21.     Following the issuance of this warrant, I will collect the **Target Telephone** and subject it to analysis. All forensic analysis of the data contained within the telephone

*Affidavit in Support of Search Warrant*

1  and the memory card will employ search protocols directed exclusively to the
2  identification and extraction of data within the scope of this warrant.

3  22. Based on the foregoing, identifying and extracting data subject to seizure
4  pursuant to these warrants may require a range of data analysis techniques, including
5  manual review, and, consequently, may take weeks or months. The personnel
6  conducting the identification and extraction of data will complete the analysis within
7  ninety (90) days, absent further application to this court.

8  **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

9  23. There have been no prior attempts to obtain the evidence sought in this
10 warrant, except as described herein.

11 **CONCLUSION**

12 24. Based on all the facts and circumstances described above, I believe
13 probable cause exists to conclude that Roberto PARTIDA Guillen used the **Target**
14 **Telephone** to facilitate the offenses of conspiracy, smuggling and illegal importation
15 of controlled substances, and to communicate with co-conspirators. The **Target**
16 **Telephone** was likely used to facilitate the offenses by transmitting and storing data,
17 which constitutes evidence of violations of Title 18, United States Code, Sections
18 371and 545; and Title 21, United States Code, Sections 952 and 960.

19 25. Because the **Target Telephone** was promptly seized following
20 PARTIDA's search at the Otay Mesa POE, there is probable cause to believe that
21 evidence of the offenses committed by PARTIDA continue to exist on the **Target**
22 **Telephone**. As stated above, I believe that the date range for this search is from
23 February 4, 2020, up to and including September 3, 2021.

24 26. WHEREFORE, I request that the court issue a warrant authorizing HSI
25 Special Agents and/or other federal and state law enforcement officers specially trained
26 in digital evidence recovery, to search the **Target Telephone**, as described in

27
28

10

Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

JOHN P
CHRISTENSEN

Digitally signed by JOHN P
CHRISTENSEN
Date: 2022.10.21 09:28:16 -07'00'

JOHN P. CHRISTENSEN, Special Agent
Homeland Security Investigations

Subscribed and sworn to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 on October 21, 2022.

THE HON. KAREN S. CRAWFORD
United States Magistrate Judge

11

*Affidavit in Support of Search Warrant*

## **ATTACHMENT A**
## PROPERTY TO BE SEARCHED

The item to be searched is an Apple iPhone 10x Max, with IMEI number 357268091333031, associated with FP&F number 2021250600097701. The phone is currently located at the Homeland Security Investigations computer forensics evidence room at 880 Front Street, Suite 3200, in San Diego, California.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, images, audio files, videos, and location data, from February 4, 2020, up to and including September 3, 2021:

a.     tending to indicate efforts to import controlled substances into the United States from Mexico;

b.     tending to identify electronic media accounts–such as email addresses, IP addresses, social media accounts and phone numbers–used to facilitate the importation of controlled substances into the United States from Mexico;

c.     tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances into the United States from Mexico;

e.     tending to identify travel to or presence at locations involved in the importation of controlled substances, such as stash houses, load houses and delivery locations;

d.     tending to identify the user of, or persons with control over or access to, the **Target Telephone**; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

all of which are evidence of Conspiracy, in violation of 18 U.S.C. § 371; Smuggling, in violation of 18 U.S.C. § 545; and Illegal Importation of Controlled Substances, in violation of 21 U.S.C. §§ 952 and 960.